(No. 51646.-

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. CURTIS J. BROWNELL, Appellant.

*Opinion filed March 21, 1980.—Rehearing denied May 29, 1980.*

512

Mary Robinson, Deputy Defender, and Mark Schuster, Assistant Defender, of the Office of the State Appellate Defender, of Elgin (Robert Davison, Martin Carlson, Richard Cunningham, Verlin Meinz, and Charles M. Schiedel, of counsel), for the appellant.

William J. Scott, Attorney General, of Springfield, and John's H. Maville, State's Attorney, of Belvidere (Donald B. Mackay, Melbourne A. Noel, Jr., and Stuart H. Shiffman, Assistant Attorneys General, of counsel), for the People.

James J. Doherty, Public Defender, of Chicago (Robert P. Isaacson, Aaron L. Meyers, and John Thomas Moran, Assistant Public Defenders, of counsel), *amicus curiae.*

MR. JUSTICE CLARK delivered the opinion of the court:

In a five-count indictment the defendant, Curtis J. Brownell, was charged with the murder, aggravated kidnapping and rape of Louise M. Betts. Count I charged that the defendant "committed the offense of murder, in that he, without lawful justification and with the intent to kill Louise M. Betts, strangled" her and thereby caused her death. (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(a)(1).) Count II charged that the defendant committed murder by strangling Louise M. Betts, knowing that "such act created a strong probability of death or great bodily harm." (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(a)(2).) Count III charged the defendant with felony murder in that he killed the decedent while attempting or committing the forcible felony of rape (Ill. Rev. Stat. 1977, ch.

38, par. 9—1(a)(3)). Count IV charged the defendant with committing the offense "of Aggravated Kidnaping, in that he, in committing the offense of kidnaping, in violation of Illinois Revised Statutes, chapter thirty-eight, section 10—1(a)(2), knowingly and secretly confined Louise M. Betts against her will and inflicted another felony, to wit: Rape, upon her." Count V charged that the defendant "committed the offense of Rape, in that he, a male person of the age of 14 years and upwards, had sexual intercourse with Louise M. Betts, a female not his wife, by force and against her will." Ill. Rev. Stat. 1977, ch. 38, par. 11—1(a).

On September 13, 1978, after a bench trial, the defendant was found guilty of counts I, III, IV, and V by the circuit court of Boone County. Count II was dismissed on the motion of the State. The judgment of conviction under count III was subsequently vacated. A final judgment of conviction was entered as to counts I, IV and V.

The State requested a sentencing hearing for the purpose of imposing the death penalty pursuant to section 9—1(d) of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(d)). The defendant waived a jury proceeding and elected to be sentenced by the court. The court sentenced the defendant to two concurrent terms of 30 to 90 years in the penitentiary for the offenses of aggravated kidnapping and rape. The court found that based on the evidence adduced at trial two aggravating factors had been established—that the murdered individual was killed in the course of two other felonies, aggravated kidnapping and rape (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b)(6)), and that the murdered individual was an eyewitness against the defendant (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b)(7)). After hearing evidence in aggravation and mitigation, the court found that the State had proved the two aggravating factors beyond a reasonable doubt but that the defendant had not established any

mitigating factors sufficient to preclude the imposition of the death sentence. The court then sentenced the defendant to death for the offense of murder. The court set November 5, 1979, as the date for the execution of the sentence of death. The sentence was stayed (73 Ill. 2d R. 609(a)) pending direct appeal to this court pursuant to Rule 603 (73 Ill. 2d R. 603; Ill. Rev. Stat. 1977, ch. 38, par. 9—1(i)).

Through a written statement made by the defendant and admitted at trial, it was revealed that on September 27, 1977, the defendant picked up the victim, Louise M. Betts, while she was hitchhiking on a road in Boone County. The defendant held a jack knife to the victim's throat and drove to a road with cornfields on either side. The defendant stopped the car and told the victim to get out and take off her clothes. He then engaged in sexual intercourse with her. The defendant thereafter attempted to strangle the victim, but she was able to get up and run an undetermined distance. The defendant caught her, strangled her again, and then stood or jumped on her stomach and neck. The defendant dragged the victim farther into the cornfield and left her. He said he felt her pulse before he left her but he did not know whether she was dead or not.

The defendant was arrested on another charge on February 2, 1978, by Winnebago County police. On March 31, 1978, Boone County detectives requested an interview with the defendant while he was still in custody in Winnebago County on charges, unrelated to the instant case, of attempted murder and rape. The defendant was interviewed on March 31, 1978, and again on April 1, 1978. Defendant requested counsel after the first interview on March 31, 1978, and was afforded the opportunity to consult with counsel several times beginning at 6:15 p.m. on March 31, 1978. On April 2, 1978, at approximately 2 a.m. the defendant requested to see the

detectives. One of the detectives advised the defendant that he had the right to have counsel present and offered to call counsel. The defendant refused the offer, stating that his lawyer would not let him say everything he wished to say.

The defendant signed a rights waiver form and then gave a three-page statement inculpating himself with regard to the aggravated kidnapping, rape and murder of Louise M. Betts.

The defense made a motion to suppress the statement on the basis, *inter alia,* that he had been denied his right to counsel and his right to remain silent. The motion to suppress was denied. The defense also made motions to bar the imposition of the death sentence, to acquire funds for expert witnesses, to exclude questions on *voir dire* regarding the veniremen's convictions concerning the death penalty, and to hold the death penalty act unconstitutional. These and several other motions were denied, and are properly preserved for review.

The defendant attacks the written statement on two grounds: first, that its admission against him violated his right against self-incrimination under the fifth and fourteenth amendments to the United States Constitution and under article I, section 10, of the Illinois Constitution of 1970. The defendant argues that the written statement was taken from him in disregard of his right to counsel guaranteed by the sixth and fourteenth amendments to the United States Constitution and article I, section 8, of the Illinois Constitution.

The State rejoins that the defendant made a knowing, intelligent and voluntary waiver of his right to remain silent and his right to counsel.

The State has a heavy burden to show that a defendant has waived his constitutional rights in a knowing, intelligent and voluntary manner. (*Miranda v. Arizona* (1966), 384 U.S. 436, 475, 16 L. Ed. 2d 694, 724, 86

S. Ct. 1602, 1628.) We think that burden has been suffi-
ciently borne here. A detailed review of testimony at trial
concerning events leading up to the statement shows that
the defendant was in the custody of the Winnebago
County police on charges of attempted murder and rape
on March 31, 1978. At approximately 2:15 p.m. on that
day, Winnebago County detective Robert Ferger, accom-
panied by Boone County detective Joe Rollins, inter-
viewed the defendant. The defendant interrupted Rollins
during the reading of the *Miranda* rights to ask for his
attorney to be present. Rollins did not call the defendant's
attorney; instead he ceased questioning the defendant.
Before he walked out of the interview room, Rollins
placed a picture of Louise Betts, the murder victim, in
front of the defendant and asked the defendant if he
recognized the person in the picture. According to the
testimony of the two detectives received during the
hearing on a second motion to suppress, the defendant
"jerked back slightly" and responded he did not know the
person. The motion to suppress was granted so that the
incident with the photograph and testimony of the two
officers concerning it were kept from the jury during the
trial.

By 6:15 p.m. on March 31, 1978, the defendant was
represented by counsel. At that time the defendant ap-
peared in a lineup, concerning the Winnebago County
offense. The defendant met with counsel before and after
the lineup. After the lineup, Gary Arbisi, a Winnebago
County detective investigating the previously referred
to offenses informed the defendant that he could speak
to the police whether his attorney was present or not.
The defendant stated he would follow counsel's advice.
Arbisi started to say something else but counsel prevented
him from doing so.

The next day, April 1, 1978, at approximately 6 p.m.,
Arbisi and another detective went to the defendant's

home to speak with the defendant's wife concerning information they had received that the defendant had told Mrs. Brownell he was guilty of murder. Mrs. Brownell asked to speak with her lawyer. When counsel arrived he advised Mrs. Brownell not to speak to the detectives. Mrs. Brownell eventually agreed to talk to the detectives, but only if she could first speak with the defendant. The detectives then arranged a visit at the jail between the defendant and his wife. The defendant met separately with counsel, then with his wife and, later, again with counsel. Mrs. Brownell agreed to tell the police "everything" but, after a phone call with the defendant's stepfather, an attorney, she declined to make a statement.

The defendant's counsel, after his later meeting with the defendant, stated to a detective that he thought negotiations should begin with the State's Attorney to waive the death penalty in any ensuing proceeding. Counsel then met with the State's Attorneys of Boone and Winnebago counties and two assistant State's Attorneys until 10 p.m. An offer was made by the State's Attorneys that if the defendant made a written confession of murder, the death penalty would not be sought at trial. Thereafter the defendant, after conferring again with counsel, declined the offer.

A final conference took place among the defendant, defense counsel, and Detectives Arbisi and Rollins. Arbisi asked the defendant if he wished to speak to the detectives. Counsel advised the defendant not to do so. Arbisi then asked counsel for permission to speak to the defendant. Counsel granted permission. Arbisi told the defendant that while the defendant did not have to speak to the police, if he changed his mind and wanted to speak to the police, with or without counsel present, the defendant could do so. The defendant said he would follow counsel's advice. A few minutes later, on the way to his cell, the defendant was asked again by Arbisi whether he wished to

talk. The defendant answered that he needed more time. Counsel informed the other attorneys that the defendant needed more time to consider their offer. It was approximately 1 a.m. on April 2, 1978, when all parties dispersed.

Approximately one hour later, the defendant told the jailer he wanted to talk to the police. Detectives Arbisi and Packard were summoned. When they met the defendant in an interview room, Arbisi asked the defendant whether the defendant desired to have counsel present. The defendant said he did not want counsel to be present. The defendant was advised of his *Miranda* rights. The defendant said he understood his rights and signed a statement to that effect. He then gave an incriminating written statement to the police.

The defendant argues that he did not waive either the right to remain silent or the right to counsel. He states that the right to remain silent was violated when the detectives did not "scrupulously honor" it at the initial interrogation session. Also, the defendant states that any subsequent statement by him was rendered inadmissible by the initial violation of his right to remain silent.

We agree that the detectives did not "scrupulously honor" the defendant's right to cut off questioning in the first instance. (*Michigan v. Mosley* (1971), 423 U.S. 96, 104, 46 L. Ed. 2d 313, 321, 96 S. Ct. 321, 326.) The complete statement by the court in *Mosley* is "that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.' " (423 U.S. 96, 104, 46 L. Ed. 2d 313, 321, 96 S. Ct. 321, 326.) We interpret that passage, however, to include only the statement obtained as a result of not honoring the defendant's right to cut off questioning. We do not think the court intended that *all* subsequent statements are to be excluded. Indeed, our view is amply supported by the following passage

from *Michigan v. Mosley:*

> "To permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of *Miranda* by allowing repeated rounds of questioning to undermine the will of the person being questioned. At the other extreme, a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests. Clearly, therefore, neither this passage nor any other passage in the *Miranda* opinion can sensibly be read to create a *per se* proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent." (423 U.S. 96, 102-03, 46 L. Ed. 2d 313, 320-21, 96 S. Ct. 321, 326.)

(Accord, *People v. Aldridge* (1980), 79 Ill. 2d 87.) Therefore in the instant case, the trial court was correct in excluding evidence concerning the initial interrogation on March 31, 1978, on the basis that the defendant's right to cut off questioning had not been scrupulously honored. The trial court was also correct in finding that the admission of the written statement did not violate the defendant's right to remain silent. The written statement was made 36 hours after the initial interrogation, after the defendant had conferred with counsel several times, after the defendant had been informed of his *Miranda* rights, and after the defendant had expressly declined to remain silent or to have counsel present. The defendant's right to remain silent was not violated.

We also think that the defendant's right to counsel was properly observed. Before taking the written statement from the defendant, the detective offered three times to call his attorney. The defendant declined each offer. He expressly said the attorney would not permit him to say what he wished to say to the detectives.

Finally, we do not think that the defendant's waiver of the right to remain silent and the right to counsel was defective due to the "affirmative, repeated efforts" of the detectives to obtain a confession. The detectives did not coerce or threaten the defendant into speaking with them. Moreover, most of the attempts they made to persuade the defendant to confess were made in the presence of counsel. Lastly, it was one hour after the defendant was placed in a cell and after his last contact with the detectives that he decided to confess.

The finding of the trial court on the voluntariness of a confession will not be disturbed unless it can be said that it is contrary to the manifest weight of the evidence. (*People v. Aldridge* (1980), 79 Ill. 2d 87; *People v. Medina* (1978), 71 Ill. 2d 254, 258.) We think the weight of the evidence herein is that the defendant's waiver of the right to remain silent and the right to counsel was voluntary, knowing and intelligent. The trial court properly admitted the written statement.

The defendant next argues that the trial court erred in denying his motion to preclude questions during *voir dire* concerning the death penalty. The defendant asserts specifically that "death qualification" *voir dire* questions result in a jury biased in favor of the prosecution in violation of the defendant's right to an impartial trial. After the trial court denied his motion, the defendant waived his right to a jury trial. The defendant now argues that the court "improperly influenced" him to waive his right to a jury trial by denying the motion to preclude "death qualification" questions. The State argues in reply that the

defendant, by waiving his right to a jury trial, has not preserved an issue for review.

We think that the defendant has preserved for review the question of whether the trial court properly denied the motion to preclude "death qualification" questions on *voir dire*. The defendant made the motion; it was denied; and he is raising the propriety of the court's denial on appeal. (See, *e.g., People v. Duchant* (1939), 370 Ill. 650, 652.) Where we agree with the State is that, in subsequently waiving the right to a jury trial, the defendant eliminated the need to conduct *voir dire*. The defendant cannot then assert that had *voir dire* been conducted, the court would have erroneously selected a jury, in contravention of *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770. The defendant offers no factual basis whatsoever for this contention, and we reject any presumption that the court would err.

The defendant's concomitant contention is that the court "improperly influenced" him to waive a jury trial when it denied the motion. No act of the court prevented the defendant from having a jury trial. If error had occurred in *voir dire,* the defendant could have objected at that point and counsel could have drawn the court's attention to the error. If the error was not corrected, the defendant could raise the issue here. The defendant did none of this. Instead he argues that he was deprived of a jury trial because of error which *might* have occurred, but did not. We will not indulge in speculation as to what error the court might have committed, and we refuse to assume that the spectre of speculative error influenced the defendant to waive his right to trial by jury.

The defendant next contends that since his indictment did not specify any one of the seven aggravating factors which must be proved to impose the death penalty (Ill. Rev. Stat. 1977, ch. 38, par. 9–1(b)), he was formally charged with "non-capital" murder and may not be

sentenced to death. The defendant asserts that the imposition of the death penalty under these circumstances violates Illinois case law and principles of double jeopardy.

The case the defendant principally relies upon is *People v. Ostrand* (1966), 35 Ill. 2d 520. The defendant's reliance on *Ostrand* is misplaced. *Ostrand* involved a conviction for unlawful use of weapons. The defendant argued there that the trial court erred when it permitted the indictment to stand because it alleged that he had committed a prior felony within five years of the date of the immediate offense. The unlawful use of weapons statute (Ill. Rev. Stat. 1977, ch. 38, par. 24–1(b)) provides that a person will be chargeable with a felony instead of a misdemeanor when a prior felony has been committed within five years of the immediate offense. Thus, this court held that it was not only proper, but also necessary, for the trial court to permit the allegation and, later, the proof of the prior felony conviction to be admitted. *People v. Ostrand* (1966), 35 Ill. 2d 520, See also *People v. Owens* (1967), 37 Ill. 2d 131; *People v. Dixon* (1970), 46 Ill. 2d 502, 504; *People v. Edwards* (1976), 63 Ill. 2d 134, 138.

The defendant bases the contention that the imposition of the death sentence violates double jeopardy principles upon the argument that the defendant has been tried twice, first in a trial for the lesser included offense of murder and then in the sentencing hearing for the offense of "capital murder." The solution, posits the defendant, lies in formally charging the defendant with all of the elements of the offense to be proved against him, particularly the statutory aggravating factor necessary to the imposition of the death sentence. Thus, argues the defendant, since he was tried a second time, without a formal charge for "capital" murder, the proceeding was violative of principles of Illinois law and the double jeopardy provisions of the fifth and fourteenth amendments to the

United States Constitution.

First of all, there is only one offense of murder in Illinois; no distinction is made between capital and non-capital murder. (See Ill. Rev. Stat. 1977, ch. 38, par. 9—1.) Secondly, without holding that every indictment must contain every aggravating factor which the State will attempt to prove, we hold that, in the indictment involved here, one of the aggravating factors found by the court at the sentencing hearing was sufficiently alleged in the indictment to fulfill the requirements of law. An indictment's allegations must be set out with such specificity or particularity that the accused is informed of the offense with which he is charged and enabled to prepare his defense and, further, that he is protected against being later prosecuted for the same crime. (*People v. Gregory* (1974), 59 Ill. 2d 111, 114.) The indictment satisfied the foregoing requirements. The defendant was charged with the murder, aggravated kidnapping and rape of Louise M. Betts on September 27, 1977. One of the aggravating factors relied upon by the court in sentencing the defendant was that the defendant intentionally murdered the victim in the course of two other felonies, aggravated kidnapping and rape. Section 9—1(b)(6) provides:

> "(b) Aggravating Factors. A defendant who at the time of the commission of the offense has attained the age of 18 or more and who has been found guilty of murder may be sentenced to death if:
>
> * * *
>
> 6. the murdered individual was killed in the course of another felony if:
>
> (a) the murdered individual was actually killed by the defendant and not by another party to the crime or simply as a consequence of the crime; and
>
> (b) the defendant killed the murdered individual intentionally or with the knowledge that the acts which caused the death created a strong probability of death or great bodily harm to the murdered individual or another; and

(c) the other felony was one of the following: armed robbery, robbery, rape, deviate sexual assault, aggravated kidnapping, forcible detention, arson, burglary, or the taking of indecent liberties with a child." (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b)(6).)

Thus, we think the indictment's allegations specifically and particularly informed the defendant of the charges against him so that he could prepare his defense and so that he was fully apprised, from indictment on, that he could potentially receive the death sentence. Since we hold the indictment sufficiently informed the defendant of the offenses against him and, in particular, that he might receive the death sentence, the defendant's contention that principles of double jeopardy were violated loses its force. The defendant was charged with the single offense of murder, and has been convicted and sentenced only once, as is wholly consistent with the guarantee afforded by the double jeopardy provisions of the fifth and fourteenth amendments to the Constitution, which assure " 'that no man can be twice lawfully punished for the same offence.' " *North Carolina v. Pearce* (1969), 395 711, 717, 23 L. Ed. 2d 656, 665, 89 S. Ct. 2072, 2076, quoting *Ex parte Lange* (1874), 85 U.S. (18 Wall.) 163, 168, 21 L. Ed. 872, 876. There was no double jeopardy here.

Finally, we emphasize that we are limiting our conclusion to one aggravating factor—that the murder was committed in the course of other felonies, *i.e.*, rape and aggravated kidnapping. While the issue was not raised by the defendant, we conclude that the second aggravating factor found by the trial court—that the murdered individual was an eyewitness or possessed other material evidence against the defendant (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b)(7)),—was not established in this case. The court appears to have made the finding that the victim was an eyewitness upon the evidence adduced at trial—that the victim, as the subject of the aggravated kidnapping and

rape, could have later testified against the defendant. We do not think this particular factual situation was intended by the General Assembly to be included within this aggravating factor. Rather, we think the General Assembly intended to include situations where, during an investigation or prosecution of a separate offense which has previously taken place, a witness is killed in an attempt to stymie the investigation or prosecution. (See Remarks of Senator Knuppel, Ill. S. Rec., 80th Gen. Assem., June 1, 1977, at 21-25.) Otherwise, were we to adopt the trial court's finding, this aggravating factor could apply in every prosecution for murder where another offense contemporaneously occurs because the victim could have been a witness against the defendant. Or, even more broadly, this aggravating factor could apply to every prosecution for murder since every victim, obviously, is prevented from testifying against the defendant. We do not think the General Assembly intended the death penalty to be applied in every murder case, and, if it did, the General Assembly could certainly find a more direct way to express its intent than through this aggravating factor. Therefore we hold that the aggravating factor relating to a murdered individual who was, or who may be, a witness against a defendant, or who may assist in the investigation or prosecution of a defendant, does not include the investigation or prosecution for the offenses which occurred in the course of the commission of the murder offense, including the murder offense itself.

The defendant's next two assignments of error challenge the constitutionality, under the cruel and unusual punishment clause of the eighth amendment and the due process clause of the fourteenth amendment, of the prosecutor's ability to request a sentencing hearing. The defendant also again argues that the indictment is defective because the death sentence hearing is begun by the prosecutor without there being any formal charge of "aggra-

vated murder," thus offending the eighth amendment.

First, as to the indictment, that issue was already decided herein. There is no offense of "aggravated," as opposed to simple, murder, in Illinois. There is simply one murder statute, which includes within it a provision for the imposition of the death sentence. Moreover, as we have already concluded, the defendant was adequately informed that, on the basis of the charges against him, he could possibly receive the death sentence since he was charged with murder while in the commission of two other felonies: aggravated kidnapping and rape. Therefore, the defendant's argument that the cruel and unusual punishment clause is violated because of the insufficiency of the indictment lacks merit.

As to the defendant's other arguments that the prosecutor's discretion to request a sentencing hearing will lead to cruel and unusual punishment and the arbitrary and capricious imposition of the death penalty in violation of the eighth amendment, we believe those issues were addressed and resolved in our recent decision in *People ex rel. Carey, v. Cousins* (1979), 77 Ill. 2d 531. There we held that the discretion vested in the prosecutor pursuant to section 9—1(d) of the murder statute (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(d)) does not offend the eighth amendment because the prosecutor does not act as the sentencing authority. He merely requests a sentencing hearing dependent upon whether the requisite elements for a death sentence exist. Also, we held that the prosecutor's discretion is sufficiently guided since he will request a sentencing hearing at the conclusion of the trial, after he will have had the opportunity to evaluate evidence to determine whether a sentencing hearing is, indeed, warranted.

The next contention of the defendant—that section 9—1(d) constitutes an improper delegation of legislative authority and an improper grant of judicial sentencing power to the executive branch—was also decided and

rejected in *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531. We need not consider it again here.

The next argument raised by the defendant is that the death penalty provisions of section 9—1 offend the due process clause of the fourteenth amendment because they permit the arbitrary imposition of the death sentence, based upon vague sentencing standards. The argument continues that the statute does not contain guidelines or standards as to the weight to be given the aggravating and mitigating factors. The pertinent provisions of section 9—1 state:

"(b) Aggravating Factors. A defendant who at the time of the commission of the offense has attained the age of 18 or more and who has been found guilty of murder may be sentenced to death if:

1. the murdered individual was a peace officer or fireman killed in the course of performing his official duties and the defendant knew or should have known that the murdered individual was a peace officer or fireman; or

2. the murdered individual was an employee of an institution or facility of the Department of Corrections, or any similar local correctional agency, killed in the course of performing his official duties, or the murdered individual was an inmate at such institution or facility and was killed on the grounds thereof, or the murdered individual was otherwise present in such institution or facility with the knowledge and approval of the chief administrative officer thereof; or

3. the defendant has been convicted of murdering two or more individuals under subsection (a) of this Section or under any law of the United States or of any state which is substantially similar to Subsection (a) of this Section regardless of whether the deaths occurred as the result of the same act or of several related or unrelated acts so long as the deaths were the result of either an intent to kill more than one person or of separate premeditated acts; or

4. the murdered individual was killed as a result of the hijacking of an airplane, train, ship, bus or other public conveyance; or

5. the defendant committed the murder pursuant to a

contract, agreement or understanding by which he was to receive money or anything of value in return for committing the murder or procured another to commit the murder for money or anything of value; or

6. the murdered individual was killed in the course of another felony if:

(a) the murdered individual was actually killed by the defendant and not by another party to the crime or simply as a consequence of the crime; and

(b) the defendant killed the murdered individual intentionally or with the knowledge that the acts which caused the death created a strong probability of death or great bodily harm to the murdered individual or another; and

(c) the other felony was one of the following: armed robbery, robbery, rape, deviate sexual assault, aggravated kidnapping, forcible detention, arson, burglary, or the taking of indecent liberties with a child; or

7. the murdered individual was a witness in a prosecution against the defendant, gave material assistance to the state in any investigation or prosecution of the defendant, or was an eye witness or possessed other material evidence against the defendant.

(c) Consideration of factors in Aggravation and Mitigation. The court shall consider, or shall instruct the jury to consider any aggravating and any mitigating factors which are relevant to the imposition of the death penalty. Aggravating factors may include but need not be limited to those factors set forth in subsection (b). Mitigating factors may include but need not be limited to the following:

1. the defendant has no significant history of prior criminal activity;

2. the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance, although not such as to constitute a defense to prosecution;

3. the murdered individual was a participant in the defendant's homicidal conduct or consented to the homicidal act;

4. the defendant acted under the compulsion of threat or menace of the imminent infliction of death or great

bodily harm;

5. the defendant was not personally present during commission of the act or acts causing death.

\*\*\*

(e) Evidence and Argument.

During the proceeding any information relevant to any of the factors set forth in Subsection (b) [aggravating factors] may be presented by either the State or the defendant under the rules governing the admission of evidence at criminal trials. Any information relevant to any additional aggravating factors or any mitigating factors indicated in Subsection (c) may be presented by the State or defendant regardless of its admissibility under the rules governing the admission of evidence at criminal trials. The State and the defendant shall be given fair opportunity to rebut any information received at the hearing.

(f) Proof.

The burden of proof of establishing the existence of any of the factors set forth in Subsection (b) [aggravating factors] is on the State and shall not be satisfied unless established beyond a reasonable doubt.

(g) Procedure—Jury. I

If at the separate sentencing proceeding the jury finds that none of the factors set forth in Subsection (b) exists, the court shall sentence the defendant to a term of imprisonment under Chapter V of the Unified Code of Corrections. If there is a unanimous finding by the jury that one or more of the factors set forth in Subsection (b) exist, the jury shall consider aggravating and mitigating factors as instructed by the court and shall determine whether the sentence of death shall be imposed. If the jury determines unanimously that there are no mitigating factors sufficient to preclude the imposition of the death sentence, the court shall sentence the defendant to death.

Unless the jury unanimously finds that there are no mitigating factors sufficient to preclude the imposition of the death sentence the court shall sentence the defendant to a term of imprisonment under Chapter V of the Unified Code of Corrections.

(h) Procedure—No Jury.

In a proceeding before the court alone, if the court finds that none of the factors found in Subsection (b) exists, the court shall sentence the defendant to a term of

imprisonment under Chapter V of the Unified Code of Corrections.

If the Court determines that one or more of the factors set forth in Subsection (b) exists, the Court shall consider any aggravating and mitigating factors as indicated in Subsection (c). If the Court determines that there are no mitigating factors sufficient to preclude the imposition of the death sentence, the Court shall sentence the defendant to death.

Unless the court finds that there are no mitigating factors sufficient to preclude the imposition of the sentence of death, the court shall sentence the defendant to a term of imprisonment under Chapter V of the Unified Code of Corrections." Ill. Rev. Stat. 1977, ch. 38, pars. 9—1(b), (c), (e), (f), (g), (h).

The focus of the defendant's argument is on the word "sufficient" in the statement that if the jury (or the court), determines that there are no mitigating factors *sufficient* to preclude the imposition of the death sentence, the court shall sentence the defendant to death. The defendant asserts that the trier of fact is not guided as to the weight to be given the aggravating versus the mitigating factors. Thus, argues the defendant, the statute is unconstitutionally vague.

We do not agree, and we think that this issue is controlled by the decisions in *Gregg v. Georgia* (1976), 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909, *Proffitt v. Florida* (1976), 428 U.S. 242, 49 L. Ed. 2d 913, 96 S. Ct. 2960, and *Jurek v. Texas* (1976), 428 U.S. 262, 49 L. Ed. 2d 929, 96 S. Ct. 2950, *Woodson v. North Carolina* (1976), 428 U.S. 280, 49 L. Ed. 2d 944, 96 S. Ct. 2978, and *Roberts v. Louisiana* (1976), 428 U.S. 325, 49 L. Ed. 2d 974, 96 S. Ct. 3001. In *Gregg*, in an exhaustive opinion, the Supreme Court detailed the constitutionality of the death penalty, in general, and of the Georgia death penalty statute (Georgia Code Ann. sec. 26—1101 (1972) (murder)), in particular. The court held that the punishment of death does not invariably violate the Constitution (428

U.S. 153, 169, 49 L. Ed. 2d 859, 872, 96 S. Ct. 2909, 2923). Also, the court held that the provision of the Georgia act whereby the trier of fact "considers" the aggravating and mitigating circumstances at a separate sentencing proceeding does not result in the capricious or freakish imposition of the death sentence. 428 U.S. 153, 169, 49 L. Ed. 2d 859, 872, 96 S. Ct. 2909, 2923.

The court stated that *"Furman* [*v. Georgia* (1972), 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726,] mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." (*Gregg v. Georgia* (1976), 428 U.S. 153, 189, 49 L. Ed. 2d 859, 883, 96 S. Ct. 2909, 2932.) The court went on to conclude that while the process whereby the sentencing authority weighed the aggravating circumstances, proved beyond a reasonable doubt, against the mitigating circumstances, is by necessity somewhat general, it provides guidance to the sentencing authority and reduces the likelihood that the death sentence will be imposed capriciously or arbitrarily. (*Gregg v. Georgia* (1972), 428 U.S. 153, 193-95, 49 L. Ed. 2d 859, 886, 96 S. Ct. 2909, 2935.) The court further said that the safeguard of meaningful appellate review, taken together with the requirement that the sentencing authority specify the factors it relied upon to reach its decision, would further insure that death sentences are not imposed capriciously or in a freakish manner. 428 U.S. 153, 195, 49 L. Ed. 2d 859, 886-87, 96 S. Ct. 2909, 2935.

*Proffitt v. Florida* (1976), 428 U.S. 242, 49 L. Ed. 2d 913, 96 S. Ct. 2960, may be even more pertinent since there, as here, the court imposed the death sentence; in *Gregg* the jury sentenced the defendant to death. The

court upheld the Florida statute as constitutional. Under that statute (Fla. Stat. Ann. sec. 782.04 (Supp. 1979) (murder)), a jury may hear evidence in a hearing separate from the trial. At the conclusion of the hearing the jury considers "[w]hether sufficient mitigating circumstances exist *** which outweigh the aggravating circumstances found to exist; and *** [b]ased on these considerations, whether the defendant should be sentenced to life imprisonment or death." (Fla. Stat. Ann. secs. 921.141(2)(b), (c) (Supp. 1979).) The jury's verdict is determined by majority vote. It is only advisory however; the actual sentence is determined by the trial court. The court also is required to weigh the statutory aggravating and mitigating circumstances before imposing sentence. There is automatic review by the Supreme Court of Florida, though unlike Georgia, review need not take any specific form. The gist, therefore, of the Georgia, Florida and Texas statutes is that the sentencing authority, be it judge or jury, "must focus on the individual circumstances of each homicide and each defendant" (*Proffitt v. Florida* (1976), 428 U.S. 242, 252, 49 L. Ed. 2d 913, 922, 96 S. Ct. 2960, 2966; see also *Gregg v. Georgia* (1976), 428 U.S. 153, 199, 49 L. Ed. 2d 859, 96 S. Ct. 2909, 2937; *Jurek v. Texas* (1976), 428 U.S. 262, 271, 49 L. Ed. 2d 929, 938, 96 S. Ct. 2950, 2956; *Woodson v. North Carolina* (1976), 428 U.S. 280, 303-05, 49 L. Ed. 2d 944, 960-61, 96 S. Ct. 2978, 2991; *Roberts v. Louisiana* (1976), 428 U.S. 325, 333-34, 49 L. Ed. 2d 974, 981-82, 96 S. Ct. 3001, 3006), which necessarily entails that weight be given to mitigating as well as aggravating circumstances where the death sentence might be imposed. *Lockett v. Ohio* (1978), 438 U.S. 586, 604, 57 L. Ed. 2d 973, 990, 98 S. Ct. 2954, 2965.

The Illinois statute certainly falls within the rule set down by the Supreme Court. Sections 9—1(g) and (h)

provide that, once the State has proved the existence of any of the aggravating factors (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b)), beyond a reasonable doubt (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(f)), a unanimous jury or the court must weigh the mitigating factors against the aggravating factors and must conclude that no mitigating factors sufficiently preclude the imposition of the death sentence. Without doubt, a balancing process is required; while the precise weight to be given each aggravating and mitigating factor is not made a matter of numerical calculation, that is not a constitutional infirmity. Rather, since the sentencing authority is given specific evidence to weigh, based upon the particularized circumstances of the case, any " 'discretion to be exercised is controlled by clear and objective standards so as to produce non-discriminatory application.' " *Gregg v. Georgia* (1976), 428 U.S. 153, 198, 49 L. Ed. 2d 859, 888, 96 S. Ct. 2909, 2936, quoting *Coley v. State* (1974), 231 Ga. 829, 834, 204 S.E.2d 612, 615. As stated in *Proffitt*: "While the various factors to be considered by the sentencing authorities do not have numerical weights assigned to them, the requirements of *Furman* are satisfied when the sentencing authority's discretion is guided and channeled by requiring examination of specific factors that argue in favor of or against imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition." *Proffitt v. Florida* (1976), 428 U.S. 242, 258, 49 L. Ed. 2d 913, 926, 96 S. Ct. 2960, 2969.

Several mitigating factors were considered by the court. It made the following findings: The court found, as factors not enumerated in the statute, that the defendant voluntarily confessed to the offenses of which he was convicted; that the defendant had a stable work record, held a responsible job and supported his family; that the defendant served in the armed forces and was honorably

discharged; that the defendant might receive aid from his family; and that the defendant had stated that he possessed religious convictions. The court also made findings as to the absence of statutory mitigating factors. Specifically the court found that the defendant was "personally present during the commission of the act[s]" causing death; that the defendant did not act "under compulsion of threat, or menace of the imminent infliction of death or great bodily harm"; that the murdered individual was not "a participant in the defendant's homicidal conduct" and did not consent to the defendant's homicidal act; that the defendant did not act under the influence of an extreme mental or emotional disturbance but rather by "a deliberate methodical design"; and, finally, that since the defendant, at the time of sentencing in this matter, had been recently convicted of, but not sentenced for, attempted murder and rape in the circuit court of Winnebago County, and had a history of lesser offenses, the defendant had a significant history of prior criminal activity.

The trial court found beyond a reasonable doubt the existence of two aggravating factors. We have upheld the finding of the court that a murder was committed in the course of the felonies of aggravated kidnapping and rape. The other aggravating factor found by the court we have concluded, as a matter of statutory interpretation, did not exist. Thus, we deem it necessary to a complete and fair sentencing hearing that we vacate the sentence of death and remand this cause to the circuit court for a new sentencing hearing, as to the imposition of the death penalty only; the sentences for the other offenses will stand. The partial resentencing hearing is essential because of the profound importance we attach to the trial court's role in weighing aggravating and mitigating factors. In this instance, the trial court weighed an aggravating factor

which we have concluded figured erroneously in the court's sentencing decision. We have now removed that factor from the scale. Whether the scale will remain stable or will tip as a result of our conclusion is initially for the trial court to determine. For us either to affirm or reverse the trial court's sentence, without providing the trial court an opportunity to resentence in light of our conclusion of law, would usurp the trial court's function as the sentencing authority. Needless to say, we in no way intimate what the trial court's sentence, upon remand, should be. That decision must be left to the trial court since it was the court which saw and heard the evidence and is best able to impose an appropriate sentence.

The next issue we consider is whether the defendant's waiver of a jury proceeding at the sentencing hearing was knowing and understanding. The defendant specifically avers that the defendant was not aware that one juror's belief that no aggravating factor had been established beyond a reasonable doubt, or that a mitigating factor sufficient to preclude the imposition of the death penalty had been proved, "would terminate the death penalty proceedings against him." Without deciding whether a defendant must always be made aware of the foregoing before he may make a knowing waiver of a jury proceeding, we conclude that the record reveals that the defendant in this case was so informed by the court:

> "THE COURT: Let me explain to you that there is a very important provision in the law which states that you have a right to have a trial by jury on the question of whether a death penalty is to be imposed. That right cannot be taken away from you unless you actually knowingly waive the right to have a jury trial. If you waive the right then a Judge will hear the same evidence that would be heard before a jury. However, instead of having twelve jurors reach a *unanimous verdict of 12—0* the Judge alone would make the decision upon hearing the evidence. If you

wish to avail yourself of the right to have the jury trial you are entitled to do that. Is that essentially what has been explained to you by your Attorneys?

DEFENDANT: Yes, completely." (Emphasis added.)

We perceive that the foregoing, especially the phrase "unanimous verdict of 12—0," amply informed the defendant of the fact that one juror's belief that the statutory requirements had not been met could preclude the imposition of the death sentence. Moreover, the defendant was ably represented by counsel, who explained the procedure to the defendant. We think the defendant made a knowing and understanding waiver of the right to have a jury proceeding.

We next turn to the defendant's contention that the trial court erred in the sentencing hearing when it concluded that the defendant had proved no mitigating factor sufficient to preclude imposition of the death sentence. Specifically the defendant argues two points: first that proof of any one of the five statutory mitigating factors always precludes the imposition of the death sentence; and, second, that the defendant proved the existence of the following statutory mitigating factor: "the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance, although not such as to constitute a defense to prosecution." (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(c)(2).) Thus, argues the defendant, he may not be sentenced to death.

We do not agree that the proof of one statutory mitigating factor always precludes the imposition of the death sentence, as defendant contends. We have reviewed the remarks made on the floor of the Illinois House of Representatives which defendant claims support his contention. We do not think they are controlling, because the statute itself provides a weighing process is to be performed between the aggravating and mitigating factors. (Ill. Rev. Stat. 1977, ch. 38, pars. 9—1(g), (h).) Moreover,

the Supreme Court, in interpreting statutes similar to our own, has repeatedly and approvingly emphasized that a weighing process must take place. (*Gregg v. Georgia* (1976), 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909; *Proffitt v. Florida* (1976), 428 U.S. 242, 251, 49 L. Ed. 2d 913, 922, 96 S. Ct. 2960, 2966; *Lockett v. Ohio* (1978), 438 U.S. 586, 608, 57 L. Ed. 2d 973, 992, 98 S. Ct. 2954, 2966-67.) Therefore, we hold that the proof of one mitigating factor, by itself, will not always preclude the imposition of the death sentence. Instead, the sentencing authority should carefully weigh the factors, aggravating and mitigating, in order to reach a fair and just result, one that is based on the particular circumstances of the offense and the defendant. See *Proffitt v. Florida* (1976), 428 U.S. 242, 252, 49 L. Ed. 2d 913, 922, 96 S. Ct. 2960, 2966.

We now consider the defendant's second argument, that the court erred in finding that the defendant was not under the influence of an extreme mental or emotional disturbance at the time the murder was committed. At the sentencing hearing, the court heard the testimony of four psychiatrists. One of the doctors, Albert H. Stipes, described the defendant to be suffering from "[s]chizophrenia, latent type and multiple sexual deviations." The doctor further testified that the defendant has acted under extreme mental disturbance most of his life, particularly during times of stress. The doctor also stated that the defendant has a personality disorder which may show itself by rage. In addition, the doctor testified that the defendant was under an extreme mental disturbance at the time he committed the murder, one which was caused by a "build-up" of stress. However, the doctor testified he was told nothing by the defendant about the cause of any stress the defendant may have been experiencing on the night the murder was committed.

Dr. Leroy Levitt was also called by the defendant to

testify. He stated that he diagnosed that the defendant had "a severe personality disorder, passive-aggressive type, with multiple sexual deviances." Dr. Levitt also agreed with Dr. Stipes' testimony that the defendant suffers from stress which results in an uncontrollable need to discharge his feelings. Dr. Levitt further stated that the defendant acted under an extreme mental disturbance at the time of the murder in that his violent reaction to stress is much greater than for many other people. The doctor additionally said that he did not know and did not ask the defendant what precipitating event caused the defendant to murder the victim.

The State called Dr. J. G. Graybill to testify as a rebuttal expert witness. Dr. Graybill agreed with the other two witnesses that the defendant is of a "passive-aggressive personality with sexual deviation." Dr. Graybill did not, however, believe the defendant acted under the influence of an extreme mental or emotional disturbance at the time of the murder. Lastly, Dr. Carl Hamann was called to testify. He diagnosed the defendant's condition as a character disorder, passive-aggressive personality with sexual deviation, a personality disorder. Dr. Hamann also offered the opinion that the defendant was not under the influence of an extreme mental or emotional disturbance at the time of the murder.

The court in sentencing the defendant stated that, in its view of the testimony of the four expert witnesses and the other evidence, there was no showing that on September 22, 1977, the defendant was under the influence of an extreme mental or emotional disturbance. The court concluded that the manner in which the defendant comported himself before, during and after the murder indicated a "deliberate methodical design."

There is no reason to set aside the finding of the trial judge. It is supported by the evidence. While in a case of this gravity this court will make a separate evaluation of

the record, we should not lightly overturn the findings of the trial court, particularly when they are amply supported by the record. (See, *e.g., People v. Myers* (1966), 35 Ill. 2d 311, 340-41.) Therefore the finding of the trial court that the defendant did not commit murder while under the influence of an extreme mental or emotional disturbance will be sustained.

Another contention made by the defendant is that the trial court erred when it denied his motion for the appointment of experts to compile data and to testify concerning the proportionality of his sentence and his prospects for rehabilitation. Defendant's motion alleged such testimony was necessary in order to provide an adequate basis for this court's review, apparently so that we might be better able to determine whether death sentences were being imposed "in an arbitrary and capricious manner" or "to a particular type of defendant." While we agree that the Supreme Court envisages, as defendant phrases it, a "proportionality review" by us, we do not interpret *Gregg v. Georgia* (1976), 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909, *Proffitt v. Florida* (1976), 428 U.S. 242, 49 L. Ed. 2d 913, 96 S. Ct. 2960, or *Jurek v. Texas* (1976), 428 U.S. 262, 49 L. Ed. 2d 929, 96 S. Ct. 2950, as requiring that review to be predicated upon expert testimony. Defendant has not indicated, nor do we perceive, how such testimony can be of material assistance to either the trial judge or us. The imposition of sentence in a murder case is a judicial function, the performance of which would not normally be assisted by expert testimony as to what would constitute a "proportional" sentence in a given case. And we, of course, in reviewing all death cases will be in a position to insure a reasonable degree of rationality and consistency.

The trial court in this case did provide funds for the services of a psychiatrist, Dr. Albert Stipes, and a psychologist. The defendant made no mention during the

hearing on his motion of his need for the probation and parole expert, and it seems clear that, even if that testimony were admissible, defendant has established neither the need therefor nor prejudice due to its absence.

The final assignment of error raised by the defendant is whether section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 9—1) offends the eighth and fourteenth amendments to the United States Constitution because it does not provide adequate appellate review procedures to prevent the arbitrary imposition of the death penalty.

Specifically, the defendant argues that the Illinois death penalty statute is defective concerning appellate review because it does not require a comparison by this court of all the cases in which the death sentence is imposed to determine if the death sentence is being imposed uniformly throughout the State. Additionally, the defendant argues that the Illinois statute does not provide for adequate review because it does not require the sentencing authority to make written findings as to the aggravating and mitigating factors relied upon by the judge or jury in imposing the death sentence. We conclude that the automatic appellate review procedure authorized under the statute is constitutional. Section 9—1(i) provides:

> "(i) Appellate Procedure.
>     The conviction and sentence of death shall be subject to automatic review by the Supreme Court. Such review shall be in accordance with rules promulgated by the Supreme Court." Ill. Rev. Stat. 1977, ch. 38, par. 9—1(i).

This court has promulgated new rules or has amended existing rules to comply with the statutory directive. (See 73 Ill. 2d Rules 603, 606(a), 607(a), 609(a), 611(a), 613(a).) These rules apply respectively to automatic appeal to the Supreme Court, automatic perfection of appeal in cases in which the death sentence is imposed,

appointment of two attorneys for indigent defendants, an automatic stay of sentence until final order of this court, priority in oral argument, and, finally, the mandate of this court, affirming, reversing or modifying the judgment of the trial court. In addition, Rule 615 sets forth a range of powers of a reviewing court from taking cognizance of errors or defects affecting substantial rights even though they were not brought to the attention of the trial court, to reducing the punishment imposed by the trial court. (73 Ill. 2d R. 615.) This court is empowered to do substantial justice in any case, including cases where the death sentence has been imposed. Thus the defendant's argument that section 9—1(i) offends the eighth and fourteenth amendment because it permits arbitrary imposition of the death penalty is substantially weakened.

Moreover, we view the Supreme Court's statements in its recent decisions on the constitutionality of other States' death penalty statutes to be dispositive. In *Gregg v. Georgia* (1976), 428 U.S. 153, 198, 49 L. Ed. 2d 859, 888, 96 S. Ct. 2909, 2937, the court approved the Georgia review procedure which requires that the Supreme Court of Georgia employ a staff of persons to compare Georgia cases in which the death sentence has been imposed. That statute (Georgia Code Ann. sec. 27—2537 (Supp. 1975)) also requires that the court specify in its opinion which cases it took into consideration. Finally, the statute requires the court to "review every death sentence to determine whether it was imposed under the influence of passion, prejudice, or any other arbitrary factor, whether the evidence supports the findings of a statutory aggravating circumstance, and '[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.' " (*Gregg v. Georgia* (1976), 428 U.S. 153, 204, 49 L. Ed. 2d 859, 892, 96 S. Ct. 2909, 2939.) The Georgia

statute also requires the sentencing authority to make written findings as to the "aggravating circumstance or circumstances which it found beyond a reasonable doubt." (Ga. Code Ann. sec. 27–2534.1(10)(c) (Supp. 1975).) We think it significant to note, however, that while the court approved of the Georgia statutory review procedures in *Gregg,* it also approved of the less complex procedures provided for in the Florida and Texas death penalty statutes. See *Proffitt v. Florida* (1976), 428 U.S. 242, 258, 49 L. Ed. 2d 913, 926, 96 S. Ct. 2960, 2969; *Jurek v. Texas* (1976), 428 U.S. 262, 276, 49 L. Ed. 2d 929, 941, 96 S. Ct. 2950, 2958.

The court stated in *Proffitt:* "While it may be true that [the Florida Supreme Court] has not chosen to formulate a rigid objective test as its standard of review for all cases, it does not follow that the appellate review process is ineffective or arbitrary." (428 U.S. 242, 258, 49 L. Ed. 2d 913, 926, 96 S. Ct. 2960, 2969.) The same was held as to the Texas statute. In *Jurek* it was concluded: "By providing prompt judicial review of the jury's decision in a court with statewide jurisdiction, Texas has provided a means to promote the evenhanded, rational, and consistent imposition of death sentences under law." (428 U.S. 262, 276, 49 L. Ed. 2d 929, 941, 96 S. Ct. 2950, 2958.) The same may be said of the review which will be accorded each similar case before this court. The entire record undergoes scrutiny for errors and defects. The sentencing hearing is reviewed with the object of ascertaining whether any aggravating factors are proved beyond a reasonable doubt. In fact, in the instant case, we have vacated as a matter of law the finding of the trial court that one of the aggravating factors existed. Our review of the entire record also considers whether there are no mitigating factors sufficient to preclude the imposition of the death sentence. There is no indication whatsoever that, in this case or any other, our scrutiny

of the record and of the propriety and proportionality of the sentence imposed will not be as vigorous and as observant of constitutional principles as it is required to be.

As to the written findings of the sentencing authority, it is true they are not statutorily mandated. However, in this case, the transcript of the court's findings in the sentencing hearing provides this court with as equal an opportunity to review the validity of the findings as would written findings.

In the instant case, we are of the opinion that no prejudicial error was commited at trial and that the sentences imposed by the court for the offenses of aggravated kidnapping and rape are justified. The sentence of death is vacated, pending resentencing, in light of our conclusion that one aggravating factor was erroneously included in the court's sentencing decision. In all other respects the judgment of the circuit court of Boone County is affirmed.

*Affirmed in part and reversed in part; sentence vacated; cause remanded.*