THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WILLIAM ALDRIDGE, Defendant-Appellant.

Third District   No. 77-223

Opinion filed November 29, 1978.

Robert Agostinelli, of State Appellate Defender's Office, of Ottawa, for appellant.

Michael M. Mihm, State's Attorney, of Peoria (John X. Breslin and James E. Hinterlong, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE BARRY delivered the opinion of the court:

This appeal was brought by the defendant, William Aldridge, from his conviction, following a bench trial, of armed robbery for which he was sentenced to a term of imprisonment of not less than 5 nor more than 12 years. The only issue raised in this appeal is whether the defendant was proven guilty of armed robbery beyond a reasonable doubt in light of the defense of compulsion raised by the defendant.

During the trial, the State's principal witness, Roger A. Johnson, testified that, on the date in question, he was working as a part-time clerk and bartender at Western Avenue Liquor located in Peoria. At

approximately 8 p.m. on that evening, the witness recalled, two black subjects entered the front door of the establishment and, at about the same time, three black females entered through the rear door. Johnson identified the defendant as being the second of the two black males who entered the store. The two men walked up to the front counter, stopped, and came around to the peanut machine on the side of the counter, and the first black male, later identified as Azell Perry, asked for a fifth of Wild Irish Wine, and then asked for the location of the bathroom. Before Perry started walking back in that direction, the defendant was standing alongside and behind Perry. Also, at about this time a third black male, wearing a flowered shirt, entered the store through the rear door, said something to Perry, turned, and exited by the same door.

While Azell Perry proceeded to the bathroom, the defendant stood near the peanut machine, located approximately 50 feet from the bathroom and about the same distance from the front door. Johnson went to the cooler, secured the wine and returned to the counter at which time the defendant inquired as to the cost. The defendant stated that the other individual would take care of it and then began talking to the young ladies who had entered the establishment and purportedly asked them for 70 cents.

Approximately 30 to 45 seconds later, Perry reappeared and after reaching into his pants pulled out a revolver, pointed it at Johnson and stated, "This is a professional job. Do as you're told and no one will get hurt." At this time Aldridge stood no more than one or two feet away from both Johnson and the defendant's gun-wielding companion. Perry then ordered the witness and some of the other patrons into a backroom where they were told to lie down. As Johnson was turning to comply he saw the defendant tell the three girls to "Get out of here" at which time two of them ran off and the third apparently froze. Perry then yelled to defendant Aldridge asking if he had gotten the cash register opened yet, to which the defendant responded that a key was apparently needed. Johnson indicated a key was not needed and went over to open the register. As the witness began emptying the register, the defendant told him to "get a sack," which Johnson did. The witness stated the defendant then pulled out a bottom drawer on the register and told Johnson to scoop it all out including the change. During this period of time the victim claims the defendant stated to him, "I hope you understand, but I need money too." Perry then told the victim to get back into the cooler and at this time the defendant hollered to Perry asking if he had gotten the watches, rings and wallets from the people in the back. This was apparently then accomplished by the pair.

George Fulton, an officer with the Peoria Police Department, was the next witness to take the stand on behalf of the State. Officer Fulton testified that he and Officer Logan McCarrell were dispatched to the Western Liquor Store in response to a suspicious persons call. Once there

they walked to a rear alley of the store and observed a black male wearing a pink and blue floral shirt walk past. The officer then drew his service revolver, held it alongside his right leg, and approached the rear of the liquor store. At this time the witness observed two black males approach the rear door and permitted them to exit. The first to reach the door was Azell Perry. The officers greeted the pair, at which time Perry spun around quickly and pointed a black revolver into Officer Fulton's face and told him to hold it right there. The second male, whom Fulton could not identify, was simply standing nearby. Once Perry pointed the gun at the officer, Fulton pulled up his service revolver, which he had concealed behind his leg in his right hand, and fired four shots at Perry, killing him. The second subject started running down the alley, and Officer Fulton fired one shot in his direction, but the subject was neither hit nor apprehended.

Officer David Reynolds then took the stand and testified that at approximately 11 a.m. on October 25, 1976, he had occasion to interview William Aldridge at the Detective Bureau of the Peoria Police Station. Although the defendant at first did not acknowledge any participation in the subject armed robbery, he did, after using the washroom, approach Officer Reynolds and stated, "Officer Reynolds, I was forced to do it and I'll tell you about it." After again being advised of his right to an attorney, the defendant told Reynolds that on the night of the armed robbery Azell Perry and Michael Johnson pulled up in a gold Cadillac to a corner on which the defendant was standing, called him over to the car, and asked him if he had the money he owed them from a card game. Aldridge stated he did not, and at that time, Perry took out a gun and said, "Come with us. You're going to get the money for me." The defendant then entered the car and was driven to a gas station on MacArthur and Adams Street. From there the trio proceeded to Western, and as they drove past the liquor store, one of the other two occupants stated, "Let's hit this place." The car was then driven into an alley behind the liquor store and was left running as the three men exited. Perry told Michael Johnson to go in the rear of the business while he and defendant entered the front. Aldridge told Officer Reynolds that, while they were in the establishment, Michael Johnson entered and left the premises through the back door several times. The remainder of the defendant's statement to Officer Reynolds was in substantial agreement with the earlier testimony of the store's clerk, Roger Johnson, although Officer Reynolds testified that, while the defendant was giving his statement, he repeatedly stated that he was forced to commit the armed robbery and that during the incident Perry had a gun pointed at him much of the time.

During cross-examination Officer Reynolds acknowledged that the defendant came to the police station on his own, once requested to do so. The witness recalled that the defendant stated that Perry had threatened

to kill him if he failed to cooperate in the armed robbery. In addition, Officer Reynolds offered that, in his role as a police officer, he had formed an opinion of Azell Perry as having a violent personality and that this conclusion represented a concensus of the people with whom he had spoken.

Following this testimony the State rested its case and defense counsel moved for a finding of not guilty claiming that the State had failed to prove the defendant guilty beyond a reasonable doubt, particularly in light of his affirmative defense of compulsion. The court summarily denied the motion.

Evelyn Martinez, a patron of the liquor store and victim of the armed robbery was the first person called on behalf of the defense. Her brief testimony established that at the time Perry went toward the restroom area he was in the company of the second man, although she was unable to identify this individual.

William Aldridge then assumed the stand in his own defense. He testified that, prior to the date of the armed robbery, the defendant was familiar with Azell Perry although not by that name. On one occasion at the Slipper Club, Perry asked the defendant where his "stuff" was, and when the defendant indicated he did not know what Perry was talking about, Perry warned him, "Don't play crazy with me, nigger." Perry explained that a girl told him that the defendant had removed some dope from his car. The argument continued and ultimately concluded in a fight wherein Perry began striking the defendant in the jaw until the fight was broken up. In a subsequent conversation with Perry the defendant maintained that he had not taken anything, but since he feared Perry, offered to pay for the missing dope. A couple of days later as the defendant was crossing Sixth Street, Perry, in a car, pulled up beside him and again asked for his money. When the defendant stated he did not have the money at that time, Perry stated, "Nigger, don't be playing with me," and proceeded to shoot the defendant in the leg. Perry advised the defendant that he would kill him if he told the police about the shooting.

On the night of the armed robbery, at approximately 7:30 p.m., the defendant was walking towards his aunt's house when a car again pulled up beside him. Perry jumped out of the car and asked the defendant where his money was. The defendant stated that he did not have the money then and it would take additional time to secure it. Perry pulled a pistol on the defendant and told him to get into the car. Michael Johnson was already seated in the car.

Aldridge further testified that, as the trio parked in the alley behind the liquor store, Perry told Michael Johnson to go through the back and told the defendant to come with him. Once in the store Perry ordered some wine and then told Aldridge to follow him to the bathroom. Aldridge

complied since Perry still had a gun and knew that he had used it in the past. Once at the bathroom Perry, advised the defendant, "Don't panic. Just do what I tell you." Three girls then entered the store as the men were returning from the restroom and Perry announced, "This is a professional stickup. Do as you're told and no one will get hurt." Aldridge turned toward the girls and told them to leave. Two of the three left but Perry called the final one back. The remainder of the defendant's testimony was in substantial compliance with the statement Officer Reynolds had testified to earlier concerning the actual events during and subsequent to the armed robbery. The defendant stated, however, that none of the things done during the armed robbery were done voluntarily and were done only because of the fact that Perry had threatened to kill him. Aldridge further testified that he felt he had no opportunity to escape during the course of the armed robbery because Perry's partner, Michael Johnson, was guarding the outside of the door. The defendant concluded his direct examination by denying ever having told Perry not to forget the wallets and rings and so forth from the people in the back.

During cross-examination, the defendant stated he called the police following the incident wherein Perry shot him in the leg and he was then removed to a local hospital. Although the defendant spoke with the police about the shooting, he never divulged Perry's name to them. Aldridge further testified that, although he had heard that Azell Perry had been killed in the armed robbery, he did not step forward until contacted by police, over two weeks later, because he feared some sort of retaliation by Perry's cousin or other family members.

Over objection by the State, the defense counsel then recalled Evelyn Martinez to the stand. Her limited testimony simply established that she did not, at any time during the armed robbery, hear the defendant yell to Perry asking about securing the watches and rings from the remaining patrons. The only statements made concerning these articles, according to Ms. Martinez, were initiated by Perry.

Following this testimony, the defense submitted a stipulation into evidence which established that on or about August 22, 1976, the defendant was shot in the upper left leg with a "gunshot projectile" and that this incident was reported to police. A second stipulation was then offered stating that an investigation of the crime scene had produced a palm print on the outside door casing of the restroom and that this palm print was positively identified as belonging to the defendant.

Carl Martinez was then called in rebuttal by the State. Mr. Martinez testified that he was a patron of the Western Avenue Liquor Store at the time the subject armed robbery occurred. He stated he witnessed Perry go to the restroom area, being followed by the remaining individual about 30 seconds later. On cross-examination, however, the witness

conceded that the 30 seconds was just an estimate on his part and it could have, in fact, been as little as 10 seconds. He also testified that he at no time heard the unarmed individual tell the armed individual to get the watches and jewelry of the remaining patrons. It was the armed individual who eventually removed these objects from the various patrons.

Officer David Reynolds was the final witness to be called on rebuttal by the State, and it was his testimony that it was he who had originally brought up the idea of compulsion when interviewing the defendant. However, Officer Reynolds conceded that this technique of opening a person up to conversation has in the past proven to be a good method to learn the truth.

■■ Except for offenses punishable by death, of which armed robbery is not one, a person is not guilty of an offense if that person's conduct in committing the offense was performed "under the compulsion of threat or menace of the imminent infliction of death or great bodily harm, if he reasonably believes death or great bodily harm will be inflicted upon him if he does not perform such conduct." (Ill. Rev. Stat. 1977, ch. 38, par. 7—11(a).) If the affirmative defense of compulsion is raised, it becomes the burden of the State to prove the defendant guilty beyond a reasonable doubt as to that issue, as well as proving each and every element of the offense beyond a reasonable doubt. (Ill. Rev. Stat. 1977, ch. 38, pars. 3—2(a), (b) and 7—14). In short, the State must disprove, beyond a reasonable doubt, the existence of the defense. *People v. Adcock* (3d Dist. 1975), 29 Ill. App. 3d 917, 331 N.E.2d 573.

■■ Nevertheless, it is the function of the trier of fact to determine whether the defendant sufficiently established compulsion as a defense and whether the State overcame the evidence of compulsion beyond a reasonable doubt. (See *People v. Moon* (1st Dist. 1976), 38 Ill. App. 3d 854, 350 N.E.2d 179.) In doing so, the trier of fact is in a better position than is a reviewing court to observe the witnesses as they testify and to assess the credibility of the witnesses and to give weight to their testimony. It can not be disputed that credibility is a matter to be determined by the trier of fact.

■■ Sufficient facts were presented at the trial for the trial court, as trier of fact, to disbelieve the defendant and find the defense of compulsion overcome and the defendant guilty beyond a reasonable doubt. Accordingly, the judgment of the Circuit Court of Peoria County is affirmed.

Affirmed.

STOUDER and ALLOY, JJ., concur.