THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LAWRENCE PERSON, Defendant-Appellant.

First District (4th Division)    No. 80-565

Opinion filed December 3, 1981.

Ralph Ruebner and Michael Kreloff, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr and Mary Ellen Dienes, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE ROMITI delivered the opinion of the court:

In a bench trial defendant Lawrence Person was found guilty of murder and was sentenced to the penitentiary for a term of 35 years. On appeal defendant contends: (1) the State's refusal to disclose, prior to trial, whether it would seek imposition of the death penalty, coupled with the trial court's allowance of voir dire questions concerning the death penalty coerced defendant into waiving his right to trial by jury and denied him due process of law; (2) defendant's guilt was not established beyond a reasonable doubt; (3) the trial court erred in unduly restricting defendant's cross-examination and impeachment of a State eyewitness; (4) defendant's sentence should be reduced.

We affirm.

At trial the State presented the testimony of Jeanette Brown, who witnessed the events in question. She testified that on October 11, 1978, at about 9 p.m. she drove with the defendant to the Rush Street area of Chicago "to prostitute." They bought a pint of rum and drank it with coke in the car, which defendant had parked on Chestnut near Clark Street. Brown then stationed herself at the northwest corner of Chestnut and Clark to solicit business. At about 11:30 defendant came by to share a drink and then returned to the car. Brown "caught a date," accompanying him to a nearby alley where she committed an act of fellatio for $20. She then returned to the corner. At about 1 a.m. a man subsequently identified

as the victim, John Arcus, drove up. They conversed, she got into his car, and he parked it in the same alley she had used earlier.

It was established at trial that at the time of the incident Arcus was a Chicago police officer but was dressed in civilian clothes. According to Brown, Arcus was "kind of high"; his words were "blurry" and his breath smelled of alcohol. She performed an act of fellatio on him, for which he had agreed to pay $20. But he first refused to give her anything and then gave her only $10. They argued about the money and she told him to take her back to the corner. As Arcus was pulling up his clothes the defendant approached the driver's side of the car with a knife in his hand. (At trial Brown twice stated that defendant pulled out the knife when he reached the car, but she corrected herself both times to say that he was holding the knife as he approached.) Defendant asked what was going on and stuck his head and arm through the open window on the driver's side. Arcus pulled a gun out of the glove compartment. Brown warned defendant of the gun, and defendant began to struggle with Arcus, threatening to kill him if he did not relinquish the gun. Arcus did not give it up, and defendant cut him on the forehead with the knife. During this part of the struggle Arcus told defendant he could not give him the gun because he was a police officer.

As the struggle continued the horn sounded. Defendant pulled the car door open, Arcus fell out, and the two men continued to wrestle on the ground while Brown stayed in the car. Brown saw defendant obtain the gun from Arcus and begin to back up. Arcus got up and began walking toward defendant, asking him to return the gun because he was a police officer. Defendant told him not to approach or he would shoot. Arcus had his hands in the air with the palms straight up and open as he approached. Defendant kept telling him not to approach and then fired twice. Arcus grabbed his side and began to fall but then followed defendant, who had begun to run down the alley toward Chestnut. (Brown also testified that at this point Arcus started stumbling and went behind defendant, who then began backing up into the alley.) Brown then heard three more shots. She remained in the car about five minutes and then ran down the alley. She found Arcus lying on the ground in the alley. He asked her to get help and she ran to Chestnut Street where she encountered two police officers and reported the shooting.

On cross-examination Brown admitted that in the past she had used "T's and Blues" (Talwin and Pyribenzamine) but denied ever being addicted to them. She denied having used them the day of the incident or any time in the seven-day period preceding it. She also testified that despite the alcohol she drank that day she was able to observe everything that occurred and her vision was not impaired.

According to police testimony the body of the victim was found

about 50 to 60 feet into the alley. No weapons were found underneath or around him. The toxicologist who tested a blood sample from the victim testified that he found an alcohol level of .226 percent. The trial court took judicial notice of the fact that under Illinois law a level of .10 percent by weight alcohol in the blood creates a presumption of intoxication. (Ill. Rev. Stat. 1979, ch. 95½, par. 11—501(c).) The toxicologist also testified that in his opinion the victim was under the influence of alcohol at the time of his death. It was stipulated that if called Dr. Robert Stein, Medical Examiner of Cook County, would testify that his examination of the body revealed a bullet wound to the left elbow and another one to the chest. The cause of death was the bullet wound to the chest, which perforated the heart and aorta.

Chicago Police Officer Fred Stone testified that he arrested the defendant early on the morning of October 12, 1978. A knife with ".007" inscribed in gold letters on the handle was found in defendant's pocket. According to Stone, Jeanette Brown had previously told him that the knife used by the defendant was a large ".007" knife.

Investigator Thomas Kaczka testified that when he questioned defendant at about 5 a.m. the same day he denied any knowledge of the occurrence. However, later that morning, according to the testimony of Assistant State's Attorney Edward Ozog, when defendant was told of the statements of Brown he responded with the following account of the incident. When defendant approached Arcus' car Arcus had a gun in his hand and defendant had a knife. They struggled, and defendant might have cut Arcus in the struggle. Defendant got the gun away from Arcus and went away from the car. Arcus followed, identifying himself as a police officer and asking for the gun. He offered money for it, but defendant responded that if he returned the gun Arcus would shoot him. When Arcus continued to approach defendant shot at him twice. Arcus grabbed his left arm, and defendant then ran south down the alley. When he turned and found Arcus pursuing him he fired two more shots and ran on toward the street. He reached the street, turned, and saw Arcus was coming toward him. Arcus had nothing in his hands. Defendant fired two shots and Arcus fell. Defendant fled, later discarding the gun. Ozog testified that he later returned to the scene with defendant, who retraced his steps. Defendant indicated to Ozog that when he fired the first two shots Arcus was 21 to 22 feet away. When he fired the last two shots Arcus was 30 to 45 feet away.

The State also called John Hunt, who lived in an apartment on the alley where the shooting took place. At about 2 a.m. that day he heard a car pull up in his driveway. He looked out and saw two people in the car, with the motor off. He walked away from the window and subsequently heard a horn blowing loudly. He heard his neighbor, James Yeutter,

threaten to call the police if the noise persisted and then heard what sounded like two men scuffling. A woman said "Larry, he's got a gun." A man said "Call the cops." Then he heard a man repeating "Don't hurt me." Hunt called the police, then heard a gunshot. As he again called the police he heard two more shots. He reported the shooting and again heard a shot.

The defendant presented the testimony of Hunt's neighbor, James Yeutter. He testified that his apartment also overlooked the alley. That night he heard the sound of a horn and observed a man leaning into the window of a car. He heard three voices: one female, one high-pitched male, and one low-pitched male. The female voice said "Please, please, don't shoot him." From the lower male voice he could only hear mumbling. After Yeutter threatened to call the police the higher male voice yelled out to please call them.

Defendant testified that Jeanette Brown had asked him to drive her downtown. At her request he bought her a bottle of rum. She told him she had some "T's and Blues" earlier that day and she needed some more. She was drinking to stave off sickness. Defendant denied that he drank anything before the incident. On the way downtown defendant gave Brown his knife. When they reached the Rush Street area he left the car to buy cigarettes. As he returned he heard Brown screaming for help and calling his name. He ran into the alley where he saw Arcus and Brown fighting in the front seat of a car. Defendant opened the door and found that Arcus was holding a gun. Brown was crying and said Arcus had tried to rape her. Arcus told defendant that Brown had cut him with the knife, and told him to get it from her. Defendant did so and gave the knife to Arcus. Defendant then sounded the horn to summon help. A man came out and threatened to call the police; defendant pleaded with him to do so.

At this point Brown grabbed for the gun held by Arcus. Defendant then began grappling with Arcus and wrested the gun from him. Arcus lurched at defendant with the knife. Defendant then ran down the alley, pursued by Arcus. Arcus had the knife and threatened to kill him. Defendant begged Arcus to stay back but he kept coming even after defendant fired several warning shots over and around him. Arcus was about four feet away when these first shots were fired. Defendant then fired several more times and Arcus fell down. Defendant testified that when he fired these shots he was afraid that Arcus might stab him with the knife. Defendant approached Arcus after he fell, asking him if he was all right and assuring him help was on the way. He then picked up the knife which was beside Arcus and ran. At trial defendant maintained that he gave this same account to Investigator Ozog.

On cross-examination defendant admitted that in the car Arcus had

identified himself as a police officer. He also testified that he never saw the knife between the time Arcus threatened him with it in the car and when he found it next to Arcus after shooting him.

## I

We first consider defendant's contention that he was coerced into waiving his right to a jury trial by the actions of the court and the prosecution. Prior to trial defendant sought an order requiring the prosecution to disclose whether it would seek imposition of the death penalty. The prosecution responded that this was a potential death penalty case[1] and they would be asking that the jury be voir dired under the guidelines of *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770. However, they also took the position that they were not required to divulge whether in fact they would seek the death penalty until the defendant was convicted. The trial court apparently agreed with this position, as defendant's motion was not granted. Defendant then moved to prohibit questioning of the jury concerning capital punishment. This motion was also denied. Subsequently defendant waived his right to a jury trial. Defendant's contention that the denial of these motions coerced his decision to choose a bench trial is based on the premise that a jury that is "death-qualified" under the guidelines of *Witherspoon* is more likely to convict than one not so qualified. Thus, when the prosecution refused to disclose its intentions and the judge refused to preclude questioning of the jury concerning the death penalty, defendant contends that to avoid a prosecution-oriented jury he had to choose a bench trial.

■■ We find that two recent decisions of our supreme court dispose of these contentions. In *People v. Brownell* (1980), 79 Ill. 2d 508, 404 N.E.2d 181, the defendant also asserted that the court's refusal to preclude questioning of the jury concerning the death penalty had the effect of improperly influencing him to waive his right to a jury trial because such questioning would have resulted in a jury biased in favor of the prosecution. The *Brownell* court rejected this contention, stating:

"No act of the court prevented the defendant from having a jury trial. If error had occurred in *voir dire*, the defendant could have

---

[1] Defendant had also been charged with the armed robbery of Arcus, based on his taking of Arcus' gun while armed with a knife. One murder count in the indictment was based on his shooting of Arcus while committing this forcible felony; this could have supported the seeking of the death penalty. (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(6).) However at the close of the State's case the court dismissed the charge of armed robbery on defendant's motion. The State never sought to argue that Arcus had been killed while in the performance of his official duties as a police officer, a circumstance which also could have supported the death penalty. (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(1).) No death penalty hearing was sought upon defendant's conviction.

objected at that point and counsel could have drawn the court's attention to the error. If the error was not corrected, the defendant could raise the issue here. The defendant did none of this. Instead he argues that he was deprived of a jury trial because of error which *might* have occurred, but did not. We will not indulge in speculation as to what error the court might have committed, and we refuse to assume that the spectre of speculative error influenced the defendant to waive his right to trial by jury." (79 Ill. 2d 508, 522, 404 N.E.2d 181, 188-89.)

These comments are equally applicable to the facts of this case. Moreover, our supreme court has recently rejected the underlying premise of defendant's contention of coercion, that a jury selected in the manner he sought to proscribe would be prosecution-oriented. (*People v. Lewis* (1981), 88 Ill. 2d 129, 430 N.E.2d 1346.) For these reasons we find that the actions of the trial court and the prosecution did not violate defendant's right to due process by coercing his waiver of a trial by jury.

In his briefs filed with this court defendant has also asserted in a conclusory fashion that his trial defense was hampered by the State's failure to notify him prior to trial of their intentions concerning the death penalty. However defendant has not specified in what manner his trial decisions were affected by this, other than his contentions concerning his choice of a bench trial, which we have already addressed. Because of defendant's failure to support this contention we do not reach it. We would note, however, that similar contentions were addressed in *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 397 N.E.2d 809, *cert. denied* (1980), 445 U.S. 953, 63 L. Ed. 2d 788, 100 S. Ct. 1603, and *People v. Lewis* (1981), 88 Ill. 2d 129, 430 N.E.2d 1346, but in neither case did the majority substantively decide the matter.

## II

■■ We find no merit to defendant's contentions that his guilt was not established beyond a reasonable doubt. The testimony of Jeanette Brown, together with defendant's own statement to the police, established that when defendant fired the fatal shot his victim was unarmed, apparently wounded, and was about thirty feet away. The trial court, as the trier of fact, was not required to reject this testimony and accept the exculpatory version offered by the defendant at trial. (*People v. Aliwoli* (1976), 42 Ill. App. 3d 1014, 356 N.E.2d 891; see *People v. Clark* (1972), 52 Ill. 2d 374, 288 N.E.2d 363.) Under these circumstances we find no basis for determining, as defendant suggests, that he acted in the belief, reasonable or unreasonable, that deadly force was necessary for his self-defense.

## III

Although defendant asserts that he was unduly limited in his *cross-examination* and impeachment of Jeanette Brown, his arguments are directed solely toward the court's allegedly improper refusal to allow certain impeaching testimony concerning her use of drugs. Indeed, on cross-examination of Brown defense counsel was permitted to elicit ample testimony concerning Brown's use of drugs. He was permitted to question her concerning her use of "T's and Blues" at the time of the incident and within the week prior to the incident. He elicited from her the admission that she had used those drugs in the past, although she denied ever having been addicted to them. Thus, we focus solely on the issue actually raised by defendant in his substantive argument, whether the court erred in barring testimony on this issue by other witnesses.

The evidence which defendant was precluded from introducing was as follows. It was stipulated that if called Dr. Victor Guerriero would testify that he took Brown's medical history on January 24, 1979, at Cook County Hospital. At that time she admitted to using "T's and Blues" five times per day. It was also stipulated that Dr. Pyati would testify that in November 1976 he took Brown's medical history and noted a past medical history of drug abuse. The State stipulated to this evidence subject to its objection to it on grounds of relevancy. The court reserved its ruling pending presentation of further evidence by defendant. That evidence was presented in the form of an offer of proof concerning the testimony of Dr. Carl Henson, a medical doctor with a private practice who also directed several drug abuse programs. Henson would have testified that as the result of his work he was familiar with the effects of Talwin and Pyribenzamine. He described Talwin as a depressant which causes distortion of perception and hallucinations. Pyribenzamine, an antihistamine, is used in concert with Talwin to increase the length of the euphoria brought on by Talwin. The combination is highly addictive. A usage of five times per day would indicate that the individual had been engaged in heavy use of the drug for at least four to six months because such dosages on a new user would be fatal. Users experience distortions of perception, such as interpreting friendly gestures as aggressive. Users also have been known to be subject to hallucinatory effects for five to seven days after use.

■■ ■ By this testimony defendant sought to impeach Brown's denial of having used these drugs on the day of the incident. If, as this evidence suggested, she was using these drugs five times a day within three months of the incident, then, if Dr. Henson's generalization concerning such heavy users were applied to her, it could be concluded that she must have been a user at the time of the incident. However the trial court barred this evidence, stating that it found it not impeaching. A trial judge is afforded

great discretion in determining the admissibility of expert testimony; a court of review will not upset that determination unless it was clearly and prejudiciously erroneous. (*People v. Aliwoli* (1976), 42 Ill. App. 3d 1014, 356 N.E.2d 891.) In this instance we do not find that defendant was prejudiced by the court's refusal to allow this testimony. Defendant had already testified that Brown had admitted to him that she had used the drugs at issue on the day of the incident. Moreover Brown herself had admitted to having consumed part of a pint of rum, and defendant's denial of having drunk any of it suggested that Brown had consumed all of it herself. Thus the judge had been presented with evidence concerning Brown's ability to perceive matters correctly on the day of the incident. Indeed, this direct evidence would appear to be much more convincing than that barred by the court, which would have required the acceptance and application of a series of generalizations concerning the effects of the drugs in order to arrive at the probability that the witness was under their effect when she witnessed the shooting. Nonetheless the court, while noting that Brown was under the influence of "at least [rum]" that night, pointed out that her testimony was corroborated by the defendant's own statements and on that basis chose to accept its credibility. Under these circumstances we do not find that the admission of this additional evidence would have affected the court's findings, and thus find no basis for reversal on these grounds.

IV

Finally defendant contends that his sentence was excessive. We have reviewed the trial court's findings at the sentencing hearing and find no basis for determining that he abused his discretion. Accordingly, the sentence imposed will not be disturbed. *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882; *People v. LaPointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344.

The judgment of the trial court is affirmed.

Affirmed.

JOHNSON and JIGANTI, JJ., concur.