THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HENRY REYNOLDS *et al.*, Defendants-Appellants.

First District (1st Division)   No. 85—2394

Opinion filed January 9, 1989.

Steven Clark and Kenneth L. Jones, both of State Appellate Defender's Office, of Chicago, for appellants Henry Reynolds and Arthur Reynolds.

James J. Doherty, Public Defender, of Chicago (Gwendolyn M. Bryant, Assistant Public Defender, of counsel), for appellants Patrick Maxey and Richard Moton.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., and Joan E. Disis, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BUCKLEY delivered the opinion of the court:

Defendants Henry Reynolds (Henry), Arthur Reynolds (Arthur), Patrick Maxey (Maxey), and Richard Moton (Moton) were charged by indictment with armed robbery (Ill. Rev. Stat. 1983, ch. 38, par. 18—2), armed violence (Ill. Rev. Stat. 1983, ch. 38, par. 33A—2) and attempted murder (Ill. Rev. Stat. 1983, ch. 38, pars. 8—4, 9—1). After a bench trial on these charges, defendants were convicted of armed robbery and attempted murder. Henry was sentenced to an extended term of 40 years for attempted murder and a concurrent 30-year term for armed robbery, Arthur and Moton were sentenced to concurrent terms of 20 years on those charges, and Maxey received a 10-year prison sentence.

On appeal, defendants seek reversal of their convictions on two common grounds: (1) that the State failed to prove them guilty beyond a reasonable doubt because its only eyewitness' testimony was improbable and contrary to human experience; and (2) that the State failed to prove defendants' specific intent to commit murder or armed robbery. As to defendants' individual claims, Arthur contends that the State failed to prove that he aided and abetted the commission of the crimes; Moton asserts that any actions imputed to him were legally excusable based upon compulsion and also contends that his sentence is excessive and arbitrarily disparate to defendant Maxey's sentence; and Henry, in his *pro se* brief, argues that he was denied his right to a fair trial because the trial court preformed an opinion as to his guilt and considered matters outside of the evidence. We affirm.

The record at trial discloses that on October 20, 1984, at approximately 4 p.m., David Golden, responding to a telephone call from Henry, arrived at the Reynolds' garage adjacent to the Reynolds' home at 6211 South Damen Avenue in Chicago, where Henry, a social acquaintance of Golden's, worked on Golden's car for two hours. As to the events thereafter, the State and defense presented dramatically divergent evidence. Golden, the State's only eyewitness, testified that after he observed Maxey, Moton, and Arthur, also acquaintances of his, in the garage "flickering" the lights, Henry proceeded into the garage's office, returned with a shotgun, called out to Golden and shot him in the top of his arm.

Henry then stated that he had to kill Golden and also demanded that Golden "give it up" as he attempted to seize Golden's wallet. Defying Henry's order, Golden ran around the car, at which point Maxey

grabbed him and removed approximately $40 from his front pocket. Golden thereupon fled into the yard, where Moton, Maxey, and Arthur grabbed him and dragged him back into the garage, with Maxey putting his hands around Golden's neck, Moton grabbing his left arm, and Arthur pulling him back. Henry at this point responded to Golden's pleas to be released by retorting, "No man, I'll get forty years."

Once inside the garage, Golden sought refuge under his car, but Henry, Arthur, and Maxey pulled him away from the car. Moton then "unjammed" the 12-gauge shotgun and returned it to Henry, who proceeded to shoot Golden a second time in the arm. Henry thereafter instructed Arthur, Maxey, and Moton to put Golden in the trunk of Golden's car. After the three complied with Henry's request, Golden heard three doors slam and the voices of Henry and Moton. The car drove for 30 to 60 minutes before it stopped, at which time Golden freed himself by breaking the trunk's lock with a jack handle. Golden then summoned the police from a nearby gas station.

The testimony from persons investigating the incident revealed the following. Officers Kathleen James and Richard King, responding to an emergency radio call, arrived at the gas station and observed Golden with his right arm almost totally severed. In response to their inquiries, Golden stated that he had been shot by Henry and Arthur. Before the ambulance arrived, Golden also named Maxey and Moton as his assailants.

The following day at the intensive care unit of the hospital, Officer James, accompanied by Detective Palmer and Assistant State's Attorney Kathy Quattrochi, questioned Golden concerning the events subsequent to the shooting. Golden recounted the incident, explaining how Henry, Arthur, and Maxey chased him around the garage, prevented him from leaving, and dragged him from underneath his car. He also stated that Maxey took money from his pockets, that Moton "unjammed" the gun, and that Arthur forced him to return to the garage after he ran out into the driveway.

Officer Jude Evans investigated the crime scene and found Golden's blood on the garage door, on a countertop, on the floor, and in the trunk of Golden's car. One expended 12-gauge shotgun casing was also recovered from Arthur, and the pants he wore at arrest tested positive for blood.

Defendants' version of the incident not only contradicted the State's version but also varied among each defendant. Although Henry admitted on cross-examination that he initially told police that he knew nothing about the shooting, at trial he testified in detail about the incident. He stated that after he completed the work on

Golden's car, an argument ensued over payment, at which time Golden attempted to leave without paying and Henry responded by procuring a shotgun. Golden then grabbed Henry and, in wrestling for the shotgun, Henry shot Golden accidentally.

It was when Henry was leaving the garage that he first noticed Moton inside. The two men proceeded outside and Golden followed. Once outside, Henry saw Arthur lay Golden on the ground. Henry and Moton then brought Golden into the garage and put him in Golden's car trunk. Soon after, Henry raised the garage door and Moton drove off with Golden in the trunk.

Moton testified that he heard a shot just before entering the garage. He then witnessed Maxey fleeing, and upon entering the garage, he discerned that Golden was shot and Henry had a shotgun. In response to Moton's inquiries, Henry walked toward Moton, pointing the gun at him. Moton accompanied Henry outside, where he observed Golden fall into Arthur's arms. Moton testified Arthur subsequently returned home, although he admitted on cross-examination that he told an assistant State's Attorney that Arthur helped Henry drag Golden into the garage and put him in the trunk. Moton also observed, but never assisted, Henry bring Golden back inside the garage. Moton at that point departed.

Arthur testified that when he heard banging at his door, he left his house and observed Moton and Golden outside the garage. Golden fell into his arms. Arthur panicked and returned to his house.

Sixteen-year-old Maxey testified that when he arrived at the Reynolds' garage, he witnessed Golden and Henry arguing, Henry picking up the shotgun, and the gun discharging during the struggle for the gun. Frightened, he ran to a friend's home, noticing Moton at the door as he left. Maxey returned home later that day, but never mentioned the incident to his mother.

Velora Moton testified on behalf of her brother and stated that Golden related to her that he faulted Moton for not summoning the police after the shooting, and "the only ones he wanted" were Arthur and Henry. Maxey also presented a witness, Dartanion Brown, who testified that Maxey arrived at Brown's home at approximately 7 p.m. and told him Golden had been shot.

■■ The first issue raised by all defendants is whether the trial court erred in finding defendants guilty beyond a reasonable doubt because Golden's testimony was improbable and contrary to human experience. While it is established that a conviction based upon testimony that is improbable, unconvincing and contrary to human experience requires a reversal (*People v. Garner* (1974), 19 Ill. App.

3d 728, 732, 312 N.E.2d 678, 680-81; *People v. Smiley* (1975), 32 Ill. App. 3d 948, 949, 337 N.E.2d 290, 291), the function of a trial court in nonjury cases is to determine the weight and credibility of testimony and to resolve conflicts (*People v. Jackson* (1978), 59 Ill. App. 3d 1004, 1007, 376 N.E.2d 685, 687), and its determination should not be disturbed unless manifestly erroneous (*People v. Deming* (1980), 87 Ill. App. 3d 953, 960, 409 N.E.2d 352, 357). We find that the court's acceptance of Golden's testimony was not manifestly erroneous as Golden's version of the incident is not improbable or contrary to human experience.

In support of their contention, defendants place great emphasis on the fact that Henry worked on Golden's car for two hours before the shooting, arguing that these actions are inconsistent with a person's intent to kill the owner of the car. These actions are not improbable, we find, since they are consistent with the actions of a person awaiting the arrival of his accomplices as suggested by Golden's testimony that the three defendants "flickered" the lights when they arrived. We also reject defendants' claim that the fact that Golden only had $40 on his person instead of the $300 allegedly due for the repairs indicates his testimony is improbable.

Defendants attempt to bolster their contention by asserting that Golden's testimony was uncorroborated by any other witnesses, that he was impeached at trial, and that defendants corroborated each other's testimony. None of these assertions alter our conclusion. First, it is established that the testimony of one credible witness, if positive, is sufficient to convict, even where testimony is contradicted by the accused. (*People v. Tribett* (1981), 98 Ill. App. 3d 663, 681, 424 N.E.2d 688, 701.) Golden provided positive testimony here. He consistently recounted his story, initially furnishing the names of all four defendants to police and relating substantially the same story as he offered at trial. Secondly, defendants' allegation that Golden was impeached at trial by his omission in a pretrial statement to police that the three defendants flickered the lights is unpersuasive. At the time Golden provided this statement, he was in the hospital's intensive care unit on a cardiac monitor, receiving oxygen continuously, making interrogation difficult. Furthermore, the fact that defendants flickered the lights may not have been viewed by Golden as very significant in light of the other aggressions Golden recounted.

Finally, as to defendants' assertion that their corroborated testimony is more believable, when viewed together, their testimony was replete with inconsistencies. Henry and Moton directly contradicted one another as to who brought Golden back into the garage, put him

in the trunk, and drove off with Golden in the trunk. Henry and Moton also admitted making prior inconsistent statements before trial. Additionally, Arthur's testimony was contradicted by Moton's admission on cross-examination of a pretrial statement that Arthur dragged Golden into the garage and is inconsistent with the fact that a shotgun shell was found on Arthur on the day of the incident.

· Although Maxey's testimony was corroborated by his codefendants, a trier of fact is not required to reject the testimony of an eyewitness and accept the exculpatory version offered by an accused at trial (*People v. Person* (1981), 102 Ill. App. 3d 474, 480, 430 N.E.2d 116, 121), nor do conflicting testimony and corroboration of a defendant's testimony themselves require a reversal where the prosecution presents sufficient evidence to convict. (*People v. Dixon* (1976), 39 Ill. App. 3d 132, 136, 350 N.E.2d 193, 196.) Maxey cites *People v. Ray* (1980), 83 Ill. App. 3d 1029, 404 N.E.2d 1073, to support his assertion that the court should have afforded great weight to his codefendant's statements that exculpated him. *Ray* holds that where an alleged accomplice's exculpatory testimony is not harbored by a desire for leniency, it will not. be viewed with the traditional infirmities of uncorroborated accomplice testimony. In *Ray*, however, the court found that the accomplice harbored no desire for leniency since she had previously pleaded guilty to the same offense on trial, while in this case, Maxey's accomplices were on trial and their corroborating statements would suggest that Golden was not credible, thereby exculpating themselves as well.

■■ ■ The next issue raised by all defendants is whether the State proved beyond a reasonable doubt that they intended to kill Golden. In a prosecution for attempted murder, the State must prove the specific intent to take a life in order to sustain a conviction. (*People v. Henry* (1971), 3 Ill. App. 3d 235, 278 N.E.2d 547; Ill. Rev. Stat. 1983, ch. 38, pars. 8—4, 9—1.) Defendants contend that the injury to Golden's arm indicates that defendants did not intend to kill him, reasoning that Henry would have fired a direct fatal shot if he intended to kill Golden. Defendants, however, ignore Golden's testimony that Henry expressed his intention to kill· Golden before he fired the second shot. Although the other defendants did not express such an intent, specific intent to kill may be inferred not only from the character of the assault upon the victim but from other circumstances as well. *People v. Mitchell* (1984), 105 Ill. 2d 1, 9, 473 N.E.2d 1270, 1274; *People v. Myers* (1981), 85 Ill. 2d 281, 289, 426 N.E.2d 535, 539.

In *Myers*, the Illinois Supreme Court upheld a conviction for attempted murder where the defendants cut the victim's throat and left

him bleeding severely without any transportation to seek medical assistance, concluding that these circumstances amply supported the trial court's finding that defendants believed that the victim would bleed to death from his injuries and that they had done all that was necessary to achieve that result. (85 Ill. 2d at 288, 426 N.E.2d at 539.) Similarly, evidence presented here that Golden was shot twice in the arm, bleeding severely, put in a locked trunk, and abandoned sustains a finding that defendants possessed the specific intent to kill Golden.

■ Henry further maintains that since the indictment charges that the attempted murder occurred only by a shooting, the record must show that defendants had the specific intent to kill when the shots were fired and their act of putting Golden in the trunk thereafter is irrelevant. Henry asserts that the evidence shows two different crimes with different intents, one crime involving only the intent to injure Golden by shooting him in the arm and a second crime involving the transporting of Golden in the trunk of his car. It is clear from the record, however, that the shooting and placing of Golden in the trunk was a single, ongoing offense. The evidence disclosed that all defendants were involved in a single course of conduct, beginning with the flickering of the lights and ending with the abandonment of the car. Henry's statement in the presence of his codefendants that he would kill and rob Golden shows Henry had the same specific intent throughout his actions. Furthermore, the fact that the indictment includes defendants' attempt to kill by shooting, but omits defendants' actions relating to Golden's abandonment is irrelevant since the only required elements in an attempted murder indictment are the attempt to kill and the specific intent to commit murder, while the manner in which defendants took a substantial step toward the commission of the crime is surplusage. (*People v. Mullinax* (1979), 67 Ill. App. 3d 936, 941, 384 N.E.2d 1372, 1376; *People v. Drink* (1967), 85 Ill. App. 2d 202, 207-08, 229 N.E.2d 409, 410.) It is only where the means used are integral parts of the offense, such as in the crime of assault with a deadly weapon, that the means must be averred. *People v. Coleman* (1971), 49 Ill. 2d 565, 571, 276 N.E.2d 721, 724; *People v. Grieco* (1970), 44 Ill. 2d 407, 411, 255 N.E.2d 897, 899.

■ Turning to defendants' individual claims, Arthur contends that the State failed to demonstrate a common design necessary to prove that he aided and abetted the commission of the crime. In cases involving aiding and abetting, where two or more persons engage in a common criminal design or agreement, any acts in furtherance thereof committed by one party are considered to be acts of all the

parties to the common design. (*People v. Feierabend* (1981), 98 Ill. App. 3d 731, 424 N.E.2d 765; *People v. Balls* (1981), 95 Ill. App. 3d 70, 419 N.E.2d 571.) Common criminal design exists where a person attaches himself to a group which commits an unlawful act to which it appears all assented (*People v. Bolden* (1978), 59 Ill. App. 3d 441, 449, 375 N.E.2d 898, 904), although mere presence at the scene of the crime is not culpable and knowledge by the defendant that a crime was being committed does not constitute aiding or abetting. *People v. Grice* (1980), 87 Ill. App. 3d 718, 725, 410 N.E.2d 209, 216; *People v. Owens* (1975), 32 Ill. App. 3d 893, 895, 337 N.E.2d 60, 62.

■ The evidence in the instant case shows that Arthur was not "merely present" at the crime scene but actively participated. Golden observed Arthur flickering with the lights before Henry shot Golden. Arthur dragged Golden back into the garage after the first shooting, and after Golden was shot a second time, helped his codefendants put him in the trunk. These actions sufficiently establish that Arthur participated in a common criminal scheme and that he aided and abetted the commission of the crimes.

■ Next, Moton contends that the evidence here establishes that any actions imputed to him were legally excusable based upon compulsion. Moton refers to his testimony concerning his initial encounter with Henry and Golden when he walked into the garage after Golden was shot and asked, "What the hell is going on?" Moton testified that Henry responded by walking towards him, pointing the gun at him, and that after Moton backed out of the garage, he returned inside the garage at Henry's direction.

The defense of compulsion is an affirmative defense which the State must disprove, but the defendant must also introduce sufficient evidence of compulsion to raise the issue of fact creating reasonable doubt as to guilt. (*People v. Williams* (1981), 97 Ill. App. 3d 394, 422 N.E.2d 1091.) Section 7—11 of the Criminal Code of 1961 sets forth the necessary elements to raise the issue of compulsion:

> "A person is not guilty of an offense, other than an offense punishable with death, by reason of conduct which he performs under the compulsion of threat or menace of the imminent infliction of death or great bodily harm, if he reasonably believes death or great bodily harm will be inflicted upon him if he does not perform such conduct." (Ill. Rev. Stat. 1985, ch. 38, par. 7—11.)

It is the function of the trier of fact to determine, by judging the credibility of the witnesses, whether the defendant has sufficiently established these elements and whether the State overcame the evi-

dence of compulsion beyond a reasonable doubt. *People v. Aldridge* (1978), 65 Ill. App. 3d 995, 1000, 383 N.E.2d 19, 23; *People v. Moon* (1976), 38 Ill. App. 3d 854, 865, 350 N.E.2d 179, 187.

■ In performing this function, the trial court was presented with contradictory testimony. Moton's testimony that Henry held a gun on him and forced him to assist in the crime was refuted by the testimony of Golden and Henry. Golden testified to a number of acts committed by Moton, but never stated that Henry pointed the shotgun at Moton. In fact, Golden testified that at one point, Moton was in possession of the shotgun. Henry also denied pointing a gun at Moton or threatening him. Based upon this testimony, the trial court properly rejected Moton's version of the incident.

Furthermore, even accepting Moton's testimony on its face, it is insufficient to establish the defense of compulsion. The defense of compulsion is not available where the defendant had an opportunity to withdraw from the criminal activity but did not do so. (*People v. Colone* (1978), 56 Ill. App. 3d 1018, 372 N.E.2d 871; *People v. Lighting* (1967), 83 Ill. App. 2d 430, 228 N.E.2d 104.) Moton testified on cross-examination that when Henry walked toward him the gun was pointed down. He also could not recall whether Henry had anything in his hand when Henry and Moton were outside the garage. Moton further admitted on cross-examination that he told the police that at some point Henry placed the gun in the trunk of a "fifty-something T-bird." Consequently, Moton's own testimony establishes possible opportunities to withdraw and, therefore, is insufficient to raise the issue of fact.

■ Moton also claims that his 20-year prison sentence for his conviction of two Class X offenses with sentence ranges of 6 to 30 years is arbitrarily disparate to that of Maxey's 10-year sentence, and also is excessive. As to his latter claim, Moton argues that, in light of his lack of criminal background, the court failed to consider his rehabilitative potential as constitutionally and statutorily required. (Ill. Const. 1970, art. I, §11; Ill. Rev. Stat. 1985, ch. 38, pars. 1—2(c), 1001—1—2(a).) It is also constitutionally and statutorily required, however, that the sentencing court consider the seriousness of the offense as well as other aggravating factors. (Ill. Const. 1970, art. I, §11; Ill. Rev. Stat. 1985, ch. 38, pars. 1001—1—2(b), 1005—5—3.2.) The record here reveals that the trial court heard Moton's argument concerning his lack of criminal record and fulfilled its statutory obligation to consider factors in aggravation and mitigation. (Ill. Rev. Stat. 1985, ch. 38, pars. 1005—5—3.1, 1005—5—3.2.) Additionally, in sentencing defendants, the trial court noted Moton's lack of criminal history, but

emphasized the seriousness of the crime, commenting on the fact that Moton left Golden to bleed to death in the trunk of his car, the obvious total impairment of Golden's arm, and the need for deterrence of such crimes. Accordingly, we find that Moton's 20-year prison sentence is not excessive.

As to Moton's claim of sentence disparity, he argues that the 10-year difference in his sentence and Maxey's sentence was arbitrarily imposed, claiming that there is no basis in the nature of the two defendants' participation in the crime or in their criminal records for the court to impose a greater punishment on Moton. It is established that where the record shows that the disparity in sentences is warranted by differences in the nature and extent of defendant's participation in the offense, the sentence will be upheld. (*People v. Godinez* (1982), 91 Ill. 2d 47, 54, 434 N.E.2d 1121, 1126; *People v. Rodriguez* (1978), 59 Ill. App. 3d 769, 774, 376 N.E.2d 460, 463.) The record here demonstrates that Moton more actively participated in the attempted murder than did Maxey. Moton handled the shotgun, unjammed the gun for Henry to shoot Golden a second time, and transported Golden in his car and left him to bleed to death in the trunk, while Maxey did not handle the shotgun nor did Golden hear his voice in the car while he was inside the trunk. The sentences, therefore, were not arbitrarily imposed by the trial court.

Finally, we address the arguments raised by Henry in his *pro se* supplemental brief. Henry first contends that he was denied his right to a fair and impartial trial because the court formed an opinion as to his guilt before the end of trial as evidenced by its question to defense counsel during closing argument and its ruling on Henry's motion for a directed verdict. The court's inquiry that Henry refers to was made in response to defense counsel's argument that the defense evidence did not establish attempted murder. The court asked: "What conclusion would you draw from the fact that Golden, after being shot and very severely wounded, is dumped into the trunk of a car and driven many miles from a place where an ambulance could have been summoned?" We find this question does not indicate a preformed opinion as to Henry's guilt since it only asks counsel's opinion as to the conclusion to be drawn from evidence introduced by Henry himself.

The trial court's comments on its denial of defendants' motion for directed verdict at the close of the State's evidence also do not indicate that the court preformed an opinion as to Henry's guilt. The statement in issue, "[A]t that juncture, based upon the evidence before the court *** the State had proved its case beyond a reasonable

doubt," recites the proper standard in Illinois for a directed verdict made by a criminal defendant. (*People v. Rey* (1985), 136 Ill. App. 3d 645, 483 N.E.2d 982; *People v. Withers* (1981), 87 Ill. 2d 224, 429 N.E.2d 853; *People v. Easter* (1981), 102 Ill. App. 3d 974, 430 N.E.2d 612.) Moreover, a court's ruling on a motion for a directed verdict involves a question of law and does not adjudicate any issue of fact. (*People v. Garcia* (1971), 3 Ill. App. 3d 365, 369, 279 N.E.2d 741, 744.) Nor do we find, as Henry asserts, that the court's denial of his motion for a directed verdict improperly shifted the burden to Henry to prove himself innocent. *People v. Bradley* (1970), 131 Ill. App. 2d 91, 266 N.E.2d 469.

■■■ Henry lastly contends that the trial court abused its discretion in considering matters not in evidence and allowing testimony concerning Golden's injury from a nonexpert. He refers to the trial court's allegedly unsupported statement that Golden was "very close to death." Henry, however, misconstrues the court's comments to allude only to Golden's injuries. Rather, the court's following sentence indicates that it was referring to the fact that Golden was left in a locked trunk of a car while bleeding profusely.

Furthermore, a victim's testimony alone is sufficient to support a finding of bodily harm. (*People v. Green* (1977), 54 Ill. App. 3d 596, 370 N.E.2d 42.) Along with the other circumstances indicating an attempted murder, Golden competently testified as to his injuries. Golden stated, and the trial court observed, that his right hand was amputated and that he received 587 stitches. Officer James also testified that when she arrived at the gas station on the day of the incident, Golden's arm was almost totally severed and bleeding profusely. The trial court's comments, therefore, do not indicate that it improperly considered incompetent evidence or matters outside the evidence.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

MANNING, P.J., and CAMPBELL, J., concur.